IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| RICHARD W. NOLAN, | : | CIVIL ACTION |
| | : | NO. 09-5470 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ARKEMA, INC., | : | |
| | : | |
| Defendant. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          AUGUST 15, 2011


## I.   INTRODUCTION

On November 17, 2009, Plaintiff Richard W. Nolan ("Nolan" or "Plaintiff") initiated this action against Defendant Arkema, Inc. ("Arkema" or "Defendant"), alleging discrimination based on his disability, in violation of the Americans with Disabilities Act of 1990, as amended 42 U.S.C. § 12101 et seq. ("ADA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"). Plaintiff seeks back pay, front pay, loss of benefits, compensatory and punitive damages and costs. (See Pl.'s Compl. ¶¶ 44-45.) Defendants bring a Motion for Summary Judgment as to all claims in Plaintiff's Complaint. For the reasons set forth below, the Court will deny Defendant's Motion

-1-

for Summary Judgment.


## II.   BACKGROUND[1]

Nolan worked for Arkema, or its predecessor companies, for 27 years from 1980 to 2007 when he was terminated.  (Nolan Dep. 51.)  Throughout his career at Arkema, Nolan had the following jobs: machine operator, extruder operator, supervisor, assistant day foreman, shift foreman, and shift supervisor.  (Id. at 86-87.)  Nolan was a supervisor from 1988 to 2007.  In 2006/2007, Arkema's Bristol plant had approximately 85-90 employees.  (Thomas Dep. 29.)

When Nolan began his medical leave of absence, he was working at Arkema's Bristol plant in Bucks County as a shift supervisor.  (Nolan Dep. 88.)  Nolan was first diagnosed with the mental health condition of intermittent explosive disorder (IED) in October, 2006.  (Id. at 85, 124-25.)  He admitted himself to Warminster Hospital and was an in-patient care for three days. 126-27.  In January, 2007, Nolan had surgery for prostate surgery.  (Id. at 131.)  He then had an impinged nerve in his low back. (Id.)

During his absence from work, Nolan stayed in communication with his supervisor, Michael Dopson ("Dopson"), by

---

[1]    As the Plaintiff is the nonmoving party, these facts are taken in the light most favorable to the Plaintiff.

phone, email, and in person at the worksite.  (Id. at 133; Plf.'s Resp., Ex. 4-5 (email exchanges between Nolan to Dopson).)  In May, 2007, Nolan began coming into the plant on a weekly basis to communicate with Dopson and Gloria McGee ("McGee"), Secretary to the Human Resources Manager and Plant Manager.  (Nolan Dep. 143.)

On May 23, 2007, Tony Thomas ("Thomas"), the Regional Human Resources Manager, sent Nolan a letter informing him that he had exhausted his short term disability benefits and all of his allotted Family Medical Leave Act time.  Although it is Arkema's typical policy to terminate an employee once the employee has exhausted 26 weeks of short term disability and is transitioning to long term disability, that was not done with Nolan. (Id. at 77.)  Instead, while Nolan was out on disability, Arkema filled his position with a temporary foremen, overtime, and D. Tyrell ("Tyrell").  (Id. at 72, 198.)  Tyrell did not officially get Nolan's job until after Arkema terminated Nolan. (Id. at 198.)

On March 23, 2007, Dopson sent an email to McGee, copying Plant Manager Scott Tatro ("Tatro") and Thomas, stating that Nolan had sent him an email and that Nolan had some additional medical issues that could delay his return to work for approximately six weeks.  (Plf.'s Resp., Ex. 9 (email)).  Dopson also stated in the email that he spoke with Joe Saxton ("Saxton") regarding Tyrell's availability to help cover Nolan's shift and

that he also spoke with Brian Kirschner ("Kirschner") about rotating the shift supervisors' assignments to distribute overtime work more evenly.  (Id.)  Beginning in mid-April of 2007, Tyrell began working in Nolan's shift supervisor role full time on a temporary basis.  (Def. Mot. Summ. J., Undisputed Fact No. 50.)[2]

On August 2, 2007, Nolan came into the plant and met with Dopson about his return to work.  (Nolan Dep. 161-62.) Dopson took Nolan through the plant, showed him some of the changes in the plant including a new oven cleaner and changes to the control room, and talked with Nolan about what kind of training he would need to return to work the following week. (Id. at 162-63, 233.)  Nolan was at the plant for over an hour and he met and talked with his crew members.  (Id. at 162-63.) Dopson never gave Nolan any indication on that day that he did not have a job to return to.  (Id. at 234.)

On August 6, 2007, Nolan was examined by Dr. Michael Goldstein at Healthworks located at Lower Bucks Hospital. (Id. at

_____

[2]    Arkema contends that Tyrell was given Nolan's position in June or July of 2007.  However, Nolan points to the fact that Tyrell's position title was never changed in SAP, a computer system that Arkema uses to keep HR records, and that would reflect such a change.  Also, Nolan's SAP record was not changed to reflect his being terminated or no longer holding the position of shift supervisor.  Further, when Nolan stopped by the plant in August, 2007, for his return to work papers, he was not informed of this change by anyone.  Arkema has not produced any documentation of when Tyrell was given Nolan's position.  Thus, viewing these facts in a view most favorable to Plaintiff, this is a disputed fact that is assumed in favor of Nolan.

- 4 -

166.)  Healthworks is where Nolan had to go to see the company's doctor in order to obtain a clearance to return to work.  (Id. at 159.)  On August 6, 2007, Nolan received Dr. Goldstein's medical report which stated that Nolan had two restrictions: (1) no lifting more than 50 pounds and (2) no standing/walking one hour without an opportunity to sit for 20-30 minutes.  (Plf.'s Resp., Ex. 15 (medical report).)

McGee and Thomas received a copy of the August 6 medical report and reviewed it.  (McGee Dep. 66-67; Thomas Dep. 124, 127.)  Later that day, McGee called Nolan and told him that he was not allowed to return to work.  (Nolan Dep. 179.)  When Nolan spoke with Thomas, Thomas told him that with the restrictions contained on his return to work form they could not accommodate him.  (Id. at 180.)  Nolan said he did not feel that the restrictions applied to a shift supervisor's job, but Thomas disagreed with him.  Nolan told Thomas that he would return to his doctor and Healthworks to get things straightened out. (Id. at 180.)

Thomas said during his deposition that he consulted Dopson regarding the medical report, but Dopson denied this during his deposition.  (Thomas Dep. 133; Dopson Dep. 75.) However, Dopson recalls discussing with Thomas that Arekema would not bring anyone back to work if they had restrictions that prevented them from performing 100% of their tasks and duties.

- 5 -

(Dopson Dep. 102-03.)

On August 6, 2007, Thomas sent Nolan a letter stating that Arkema could not accommodate his return to work at that time due to the restrictions contained in the medical report from Healthworks. (Plf.'s Resp., Ex. 17 (the letter).)  The letter did not state that Nolan's employment was terminated.  On August 7, 2007, Nolan received the letter and called his doctor that day.  (Nolan Dep. 181-82.)  That same day, his doctor gave him a form that did not have any restrictions on his work.  Nolan called Healthworks and scheduled an appointment for August 8. (Id. at 183.)  He then called McGee and told him that he had scheduled an appointment with Healthworks.  (Id. at 183.) Shortly thereafter, McGee called him and told him to not go to Healthworks on August 8 and that he should instead go on August 10.  (Id. at 185.)  Nolan did not know why McGee had told him to go to Healthworks on the 10th instead of the 8th.  (Id. at 186.)

On August 9, 2007, Nolan received a letter from Thomas dated August 8, 2007.  (Id. at 187-88.)  The letter stated that since he and Nolan had spoken on August 6, Thomas had come to better understand the day to day operations of Arkema's Bristol plant.  (Plf.'s Resp., Ex. 18 (the letter)).  Thomas claimed that Arkema had filled Nolan's position while he was out of work, and explained that Nolan did not have a job to return to.  (Id.) Thomas encouraged Nolan to submit a job application and that if

he becomes aware of any opening at Arkema that he believes he
believes he is qualified for.  (Id.)  Nolan still went to
Healthworks on August 10 and he obtained a medical report with no
restrictions.  (Plf.'s Resp., Ex. 20 (the medical report).)
Thomas saw this form on or around August 10, 2007, but did not
contact anyone to find out why the two medical forms were
different.  (Thomas Dep. 128-29.)

     On August 17, 2007, Nolan applied for an on-line job
posting for production supervisor at Arkema's Bristol plant.
(Nolan Dep. 208.)  In response, on September 6, 2007, Thomas sent
a letter to Nolan stating that the position had been filled some
time ago.  However, Thomas said he would keep Nolan's resume on
file for two years and if an opening arose for which he was
qualified, his resume would be considered.  (Plf.'s Resp., Ex. 24
(the letter).)  In October, 2007, there was an opening for a
shift supervisor position at the Bristol plant that Nolan
qualified for.  (Dopson Dep. 115-17.)  However, Dopson did not
contact Nolan about the opening because he was aware of Thomas'
promise to Nolan and expected that Thomas would contact Nolan.
(Id. at 114-17.)  Thomas did not contact Nolan about this
position.  (Thomas Dep. 113.)

     When Thomas later completed an employer questionnaire
as part of Nolan's application for unemployment compensation
benefits, Thomas certified to the Pennsylvania Department of

Labor & Industry that Nolan voluntarily quit, that Nolan's separation from Arkema was temporary, and that Nolan failed to return to work from a leave of absence.  (Plf.'s Resp., Ex. 19 (employer questionnaire).)

On November 17, 2009, Nolan initiated his employment discrimination action against Arkema.  On January 19, 2010, Defendant submitted its answer, denying Plaintiff's claims and asserting various affirmative defenses.  On November 22, 2010, Defendant filed a Motion for Summary Judgment.  Plaintiff responded on December 13, 2010, and Defendant replied on December 27, 2010.  Defendant's Motion for Summary Judgment is now before the Court.

**III. DISCUSSION**

In Defendant's Motion for Summary Judgment, Defendant argues that it is entitled to judgment as a matter of law because: Defendant had no open position available for Plaintiff when he returned to work; Plaintiff is not disabled within the meaning of the ADA; Plaintiff does not have a record of being disabled as required by the ADA; Defendant did not regard Plaintiff as disabled; Plaintiff was not qualified to perform the essential functions of the job; and Plaintiff's PHRA claim fails for the same reason his ADA claim fails.  (See generally Def. Mot. Summ. J.)  Plaintiff responds that he does not contest that

he does not qualify as disabled but that he has raised sufficient evidence that Defendant regarding him as disabled and discriminated against him for that reason.  (See generally Plf.'s Resp.)

The Court will address the relevant legal standards. Next, taking the facts in the light most favorable to the Plaintiff, the Court will address the Plaintiff's claims.  For the reasons below, Defendant's Motion for Summary Judgment will be denied because Plaintiff has raised sufficient evidence from which a reasonable jury could believe that Defendant regarded Plaintiff as disabled, that Defendant's reason for terminating Plaintiff is pretext, and that Defendant discriminated against Plaintiff because Defendant regarded him as disabled.

A.  <u>Summary Judgment Standard Under Rule 56</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  A fact is "material" if proof of its existence or nonexistence might affect

the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the nonmoving party.  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.


B. McDonnell Douglas Framework for Analyzing ADA Claims

The ADA provides, in part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Where a plaintiff claims that he was treated

differently based on his disability or perceived disability, the
burden-shifting framework of McDonnell Douglas Corporation v.
Green applies. 411 U.S. 792 (1973); see also Shaner v. Synthes,
204 F.3d 494, 500 (3d Cir. 2000) (citation omitted).  The
McDonnell Douglas test "establishe[s] an allocation of the burden
of production and an order for the presentation of proof in . . .
discriminatory-treatment cases."  Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor
Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).

        The Third Circuit has summarized the McDonnell Douglas
framework:

        [T]he McDonnell Douglas analysis proceeds in three
        stages.  First, the plaintiff must establish a prima
        facie case of discrimination.  If the plaintiff
        succeeds in establishing a prima facie case, the burden
        shifts to the defendant to articulate some legitimate,
        nondiscriminatory reason for the employee's rejection.
        Finally, should the defendant carry this burden, the
        plaintiff then must have an opportunity to prove by a
        preponderance of the evidence that the legitimate
        reasons offered by the defendant were not its true
        reasons, but were a pretext for discrimination.

Shaner, 204 F.3d at 500-01.


    C. Plaintiff's Prima Facie Case

        Nolan "must establish a prima facie case of
discrimination."  Shaner, 204 F.3d at 500-01 (citing McDonnell
Douglas, 411 U.S. 792).  "[T]o establish a prima facie case of
disparate treatment under the ADA, a plaintiff must show '(1) he

- 11 -

is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'"  Shaner, 204 F.3d at 500 (quoting Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)).

The ADA defines "disability" with regard to an individual as either: (i) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an impairment."  42 U.S.C. §12102(2).  In this case, Plaintiff does not allege that he was actually disabled as defined under the ADA or that he was terminated based upon a record of disability.  Therefore, I will analyze Plaintiff's claim under the third definition of disability.  That is, that Plaintiff was "regarded as" having "a physical or mental impairment that substantially limits one or more . . . major life activities."

1. Nolan has Provided Sufficient Evidence that Arkema Regarded Him as Disabled Under the ADA.

First, Nolan has to establish that "'he is a disabled person within the meaning of the ADA.'"  Shaner, 204 F.3d at 500 (quoting Gaul, 134 F.3d at 580).  Under the ADA:

- 12 -

> [A] person is "regarded as" having a disability if she:
> (1) Has a physical or mental impairment that does not
> substantially limit major life activities but is
> treated by the covered entity as constituting such
> limitation; (2) Has a physical or mental impairment
> that substantially limits major life activities only as
> a result of the attitudes of others toward such
> impairment; or (3) Has [no such impairment] but is
> treated by a covered entity as having a substantially
> limiting impairment.  Taylor v. Pathmark Stores, Inc.,
> 177 F.3d 180, 187 (3d Cir. 1999); see also 29 C.F.R. §
> 1630.2(l).

Eshelman v. Agere Sys., 554 F.3d 426, 434 (3d Cir. 2009).

To make this showing, a Nolan "must demonstrate either:
(i) that despite having no impairment at all, [Arkema]
erroneously believed that [he] had an impairment that
substantially limited one or more of [his] major life activities;
or (ii) that [Nolan] had a non-limiting impairment that [Arkema]
mistakenly believed substantially limited one or more of [his]
major life activities."  Eshelman, 554 F.3d at 434 (citing Tice
v. Ctr. Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001);
Sutton, 527 U.S. 471, 489 (1999)("In both cases, it is necessary
that a covered entity entertain misperceptions about the
individual — it must believe either that one has a substantially
limiting impairment that one does not have or that one has a
substantially limiting impairment when, in fact, the impairment
is not so limiting.")).

"Even an innocent misrepresentation based on nothing
more than a simple mistake of fact as to the severity, or even
the very existence, of an individual's impairment can be

- 13 -

sufficient to satisfy the statutory definition of a perceived disability." Deane v. Pocono Medical Center, 142 F.3d 138, 144 (3d Cir. 1998)(citing 29 C.F.R. § 1630.2(I)). Thus, "the relevant inquiry is whether [Arkema] perceived [Nolan] as disabled within the meaning of the ADA, not whether [Nolan] was actually disabled at the time [Arkema] decided to terminate [him]." Eshelman, 554 F.3d at 434 (citing Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005) ("A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability."))

Nolan's "perceived disability must, in any event, substantially limit a 'major life activity.'" Eshelman, 554 F.3d at 434 (citing Sutton, 527 U.S. at 490.) "The ADA does not define 'major life activity,' but Equal Employment Opportunity Commission (EEOC) regulations define 'major life activities' as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Eshelman, 554 F.3d at 434 (quoting 29 C.F.R. § 1630.2(i); citing Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 180 n.4 (3d Cir. 2005) (deferring to definitions of terms used in the ADA as articulated in EEOC regulations)).

"It is undisputed that working . . . qualifies as 'major life activit[y].'" Eshelman, 554 F.3d at 434 (citing 29

C.F.R. § 1630.2(i) (working constitutes major life activity)).
"With regard to working, the regulations state that an individual
is 'substantially limited' if there is a significant restriction
in a person's 'ability to perform either a class of jobs or a
broad range of jobs in various classes as compared to the average
person having comparable training, skills and abilities.'"
Eshelman, 554 F.3d at 435 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).
"Accordingly, to prevail on [his] 'regarded as' disabled claim
under the ADA, [Nolan] [has] to show that [his] termination was
animated by [Arkema's] belief that [he] was unable to work in a
particular class or broad range of jobs, as required by the
definition of 'disability.'"  Eshelman, 554 F.3d at 435 (citing
42 U.S.C. § 12102(2)(A)).

        Here, viewing the facts in Nolan's favor, Nolan has
provided sufficient evidence that Arkema terminated him because
Arkema believed that he was "unable to work in a particular class
or broad range of jobs."  This case takes place within the
context of Nolan having been on short-term disability leave for
which he needed to be medically evaluated to return to work.
Arkema was aware that Nolan was admitted to Warminster Hospital
and diagnosed with the mental health condition of intermittent
explosive disorder, had surgery on his prostate, and then had an
impinged nerve in his lower back.

With these facts in mind, a jury could draw the reasonable inference that Thomas believed that the initial medical report from Healthworks which included significant restrictions (not lifting more than 50 lbs or standing/walking for more than an hour at a time) was correct and that the second medical report and Nolan's personal doctor's diagnosis were not correct. Thus, there is sufficient evidence from which a reasonable jury could find that Thomas regarded Nolan to be substantially limited in the major life activity of working.

Also, a jury could conclude that Thomas held this view with regard to a "particular class or broad range of jobs." Thomas told Nolan he would keep his resume on file for any job openings that he would qualify for, and yet never contacted Nolan when any job positions opened even though Nolan had 27 years of experience working for the company and had worked in many different positions, including: machine operator, extruder operator, supervisor, assistant day foreman, shift foreman, and shift supervisor. Further, Thomas' first letter to Nolan stated that they could not accommodate his physical restrictions.

Thus, there is sufficient evidence, when viewed in the light most favorable to Nolan, from which a reasonable jury could find that Defendant regarded Nolan as "disabled" as required under the ADA.

2. Nolan's Qualifications to Perform the Job

Second, Nolan has to establish that "'he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer.'"  Shaner, 204 F.3d at 500 (quoting Gaul, 134 F.3d at 580).  Nolan worked for Arkema for 27 years and held the shift supervisor position from 1988 to 2007.  Following his medical leave of absence, both Nolan's doctor and Arkema's clinic doctor had cleared him to return to work without restrictions.  Thus, taking the facts in the light most favorable, Nolan has meet the second prong of establishing his prima facie case.

3. Nolan's Termination and Arkema's Decision to
Not Re-Hire Him Are Adverse Actions

Third, Nolan has to establish that "'he has suffered an otherwise adverse employment decision as a result of discrimination.'"  Shaner, 204 F.3d at 500 (quoting Gaul, 134 F.3d at 580; citing Deane, 142 F.3d at 142).  "An [adverse] employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Nolan was terminated and Arkema did not re-hire him for positions that he qualified for.  Thus, Nolan was subjected to an adverse employment action

- 17 -

and Nolan has satisfied the requirements of establishing a prima facie case of discrimination.

### D. Defendant's Proffered Non-Discriminatory Reasons

Now that Nolan has established a prima facie case, "the burden shifts to [Arkema] to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Shaner, 204 F.3d at 500-01 (citing McDonnell Douglas, 411 U.S. 792). As explained in Woodson v. Scott Paper Company, the defendant's burden is "relatively light" at this stage and "it is satisfied if the defendant articulates any legitimate reason for the discharge." 109 F.3d 913, 920 n.2 (3d Cir. 1997). Therefore, Arkema must only present a reason for the action; it is not required to show by a preponderance of the evidence that its action was, in fact, motivated by the particular reason. See Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). Arkema argues that it terminated Nolan because his position had already been permanently filled and that Arkema did not re-hire Nolan because there were no available positions that he qualified for. Both reasons are legitimate and non-discriminatory. Thus, Arkema has met its "relatively light" burden.

E. Arkema's Reasons for Terminating Nolan as Pretext

Finally, because Arkema carried its burden of raising a legitimate reason for its actions, Nolan has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Shaner, 204 F.3d at 500-01 (citing McDonnell Douglas, 411 U.S. 792).  With regard to the third step of the McDonnell Douglas framework at the summary judgment stage, the Third Circuit has explained that "[a]t this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race or disability discrimination." Shaner, 204 F.3d at 501 (internal quotations and citations omitted).

To do this, "a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Shaner, 204 F.3d at 501 (internal quotations and citations omitted).

- 19 -

"To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken."  Shaner, 204 F.3d at 501 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).  "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Shaner, 204 F.3d at 501 (quoting Fuentes, 32 F.3d 759 at 765).

In this case, Nolan has pointed to sufficient evidence that, when taken in the light most favorable to him, could show that Arkema's reason for terminating Nolan was not because they did not have a position available but, instead, because of Arkema's misconceptions about Nolan's abilities.  Before Nolan went on short term disability leave, Nolan worked for Arkema, or its predecessor companies, for 27 years and worked in the position of shift supervisor for approximately eight years.  Thus, supporting a reasonable inference that something had changed to make Arkema no longer wish to employ Nolan.

First, Nolan offers evidence to show that Arkema's reason is pretext.  Arkema argues that Nolan's position was no longer available.  However, an employer's changing rationale for

making an adverse employment decision can be evidence of pretext or discrimination.  Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996); Dominguez-Cruz v. Shuttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000); EEOC v. Ethan Allen, 44 F.3d 116, 120 (2nd Cir. 1994); Aka v. Washington Hospital Center, 156 F.3d 1284 (D.C. Cir. 1998).  During Nolan's constant communications with Arkema and even his final visit days before his planned return, no one at Arkema mentioned to Nolan that his position had already been permanently filled.

Indeed, after receiving the initial medical report on August 6, 2007, Thomas sent Nolan a letter stating that Arkema cannot accommodate his return to work at this time due to the restrictions contained in the medical report from Healthworks and did not state that Nolan's employment was terminated.  Nolan points to Defendant's human resources records to show that Tyrell's title was never officially changed to shift supervisor or that he was classified as such when Nolan was terminated.  Also, when there were open positions for similar positions, Thomas did not contact Nolan about these openings.  Thus, Nolan presents sufficient evidence from which a jury could infer that this was not Arkema's reason for terminating Nolan.

Second, Nolan also offers evidence to show that his termination was motivated by discrimination.  Nolan also points to evidence that would support a reasonable inference that it was

Nolan's first medical report that included significant limitations on his ability to work that Arkema's changed its posture.  Throughout Nolan's absence, he kept in communication with his supervisor and other Arkema personnel by phone, email, and in person at the worksite.  In May 2007, Nolan began preparing to return to work by coming into the plant on a weekly basis to communicate with Dopson and McGee.  Thomas sent Nolan a letter on May 23, 2007, regarding Nolan's position.  That same day Arkema management exchanged emails discussing how they would cover Nolan's shifts.  None of these communications indicated that Arkema would be permanently filling Nolan's shift supervisor position.

Also, when Nolan came into the plant and met with Dopson about his return to work on August 2, 2007, Dopson nor anyone else indicated that Nolan no longer had a job to return to.  Instead, Dopson took Nolan through the plant that day and showed him some of the changes in the plant including a new oven cleaner and changes to the control room, and talked with Nolan about what kind of training he would need for returning to work the following week.  Nolan was at the plant for over an hour and he met and talked with many Arkema employees.

It was on August 6, 2007, when Nolan was examined by Dr. Goldstein at Healthworks that Arkema, through Thomas, changed its position.  On that day, Nolan received the medical report

filled out by Dr. Goldstein which stated that Nolan had two restrictions: (1) no lifting more than 50 pounds and (2) no standing/walking one hour without an opportunity to sit for 20-30 minutes.  Later that day, McGee called Nolan and told him that he was not allowed to return to work.  When Nolan spoke with Thomas, Thomas told him that with the restrictions contained on his return to work form they could not accommodate him.  Although Nolan told Thomas that he would return to his doctor and Healthworks to get things straightened out, Thomas' position had changed.

Indeed, Dopson recalls discussing with Thomas that Arekema would not bring anyone back to work if they had restrictions that prevented them from performing 100% of their tasks and duties.  Although the Third Circuit has not directly decided the issue, it has explained that "such a policy could be per se violative of the ADA because, when it is applied against qualified individuals with disabilities, it would, by its very terms, discriminate against those protected individuals on the basis of their disabilities, systematically denying them the reasonable accommodations to which they are entitled and excluding them from employment for which they are otherwise qualified."  Hohider v. United Parcel Service, Inc., 574 F.3d 169, 195 (3d Cir. 2009) (citing cases that have found a 100% rule

to be a per se violation)[3]; see also Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001) (finding that a "'100% healed' rule was a per se violation of the ADA" because it denied her "individual assessment for her position" impermissibly "foreshorten[ed] the inquiry" necessary under the ADA, as such policies do not violate the ADA when applied to individuals not "disabled" under the statute); McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999)(finding that a "'100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified

---

[3]      Hohider, 574 F.3d at 195-96 (also citing Warmsley v. N.Y. City Transit Auth., 308 F. Supp. 2d 114, 119-22 (E.D.N.Y. 2004) (finding the existence of a "100% healed" policy per se satisfies plaintiff's showing of discrimination on the basis of disability, but also requiring that plaintiff be "disabled" and "otherwise qualified" to have an ADA claim); Hammer v. Bd. of Educ., 955 F. Supp. 921, 927 (N.D. Ill. 1997) (denying plaintiff's request for summary judgment with respect to the claim that defendant "committed a per se violation of the ADA" by implementing an alleged "no work restrictions" policy, in part because "there [wa]s a genuine question of fact regarding whether or not plaintiff was capable of performing the essential functions of his job either with or without reasonable accommodation"); Norris v. Allied-Sysco Food Servs., Inc., 948 F. Supp. 1418, 1438 (N.D. Cal. 1996) (discussing different potential interpretations of the per se theory of liability under the ADA, all of which contemplate that "the employee could have been reasonably accommodated (without undue hardship) in a manner contrary to the [per se discriminatory] policy but was not" in order to find that the "employer violates the ADA" by implementing the policy); Hutchinson v. UPS, 883 F. Supp. 379, 397-98 (N.D.Iowa 1995) (finding that a "100% healed" policy is per se discriminatory, but that plaintiff could not assert this per se claim because she was not "disabled" and thus lacked standing to sue under the ADA)).

individual is '100% healed' from their injury for the required
individual assessment whether the qualified individual is able to
perform the essential functions of his or her job either with or
without accommodation.").

A jury could reasonably infer that Thomas did not want
to give Nolan back his position because of the initial medical
report, regardless of what a second report would determine
because of Thomas' request that Nolan delay his second
appointment at Healthworks for a second evaluation.  Nolan's
doctor had cleared him to work with no restrictions and Nolan had
already scheduled an appointment with Healthworks for the next
day.  When Thomas found out, he had his secretary tell Nolan to
re-schedule with Healthworks for two days later.  It was during
this delay that Thomas sent the second letter to Thomas stating
that he now had a better understanding of the organization he
manages, and discovered that Nolan does not have a job to return
to.

While a jury could believe that Thomas genuinely did
not learn of this fact until that moment, a reasonable jury could
also draw the inference that Thomas' alleged discovery was merely
pretext for not wanting to give Nolan his position back because
he did not want someone with his perceived disability working in
that position, regardless of what Arkema's clinical doctor found
in the second medical report.  Therefore, a reasonable jury could

find Arkema's proffered non-discriminatory reasons for terminating and not re-hiring Nolan were pretextual.

**IV. CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment will be denied and this case will be scheduled for trial.